# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

DONNA KIRKMAN, TIM KIRKMAN, BERNIE WILLIAMS, and MELANIE RODD, individually and on behalf of all others similarly situated,

        Plaintiffs,

v.

VOLKSWAGEN GROUP OF AMERICA, INC., VOLKSWAGEN AG, AUDI AG, AUDI OF AMERICA LLC, and AUDI OF AMERICA, INC.,

        Defendants.

No.

**CLASS ACTION COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Pages**

I.  INTRODUCTION ......................................................................................1

II.  PARTIES .................................................................................................2

III.  JURISDICTION AND VENUE ...............................................................3

IV.  FACTUAL ALLEGATIONS ....................................................................4

    A.  VWoA's Marketing Campaign for "CleanDiesel" .............................4

    B.  Federal and State Emissions Laws and Testing .................................8

    C.  VWoA Was Issued a Notice of Violation and Required
        To Recall 482,000 Cars .....................................................................21

    D.  The Recalled Cars Will Be Less Efficient, Less Powerful,
        and Less Valuable .............................................................................26

    E.  Plaintiffs' Purchases / Leases ..........................................................28

V.  CLASS ACTION ALLEGATIONS .........................................................31

    A.  Numerosity ......................................................................................32

    B.  Typicality.........................................................................................32

    C.  Commonality ...................................................................................32

    D.  Adequacy of Representation ............................................................33

    E.  Superiority .......................................................................................34

VI.  TOLLING OF STATUTE OF LIMITATIONS .........................................35

VII.  CAUSES OF ACTION............................................................................36

        COUNT I: Breach Of Express Warranty ..........................................36

COUNT II: Breach Of Implied Warranty Of
Merchantability ..........................................................37

COUNT III: Magnuson - Moss Act (15 U.S.C. §§ 2301,
*et seq.*) ...................................................................38

Express and Implied Warranty .........................................................38

COUNT IV: Breach Of State Consumer Fraud Acts ........................42

VIII. PRAYER.....................................................................................44

IX. PLAINTIFFS DEMAND A TRIAL BY JURY .........................................45

Plaintiffs bring this action on behalf of themselves and all others similarly situated against Defendant Volkswagen Group of America, Inc., stating as follows, upon information and belief, except as to the facts pertaining to themselves which are based on personal knowledge.

## I.   INTRODUCTION

1. This case concerns the deliberate circumvention of federal and state environmental laws and regulations by Defendant Volkswagen Group of America, Inc. ("VWoA"). VWoA and its parent company Volkswagen A.G., and VW A.G's subsidiary Audi A.G., manufactured and sold hundreds of thousands of diesel powered passenger cars to consumers in the United States, which it falsely touted as being "clean" and efficient, and all of which contained software (or "defeat device") that was designed to and did fool governmental testing programs into finding the cars to be emissions compliant. These cars were certified for sale in the U.S. while in fact expelling 40 times the allowed amount of nitrogen oxides (NOx) into the air. Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance at the Environmental Protection Agency, stated in a September, 18, 2015 EPA news release announcing a notice of violation served upon VWoA that "[u]sing a defeat device in cars to evade clean air standards is illegal and a threat to public health."  A copy of the Notice is Violation the EPA issued to Defendant, as well as a copy of the letter from the California Air

CLASS ACTION COMPLAINT - Page 1

Resources Board ("CARB"), are attached to this Class Action Complaint as Exhibits A and B, respectively.

2.     Beyond the public health threat, the vehicles were not as advertised and were far from being "clean," and when they are brought into compliance as will be required under an EPA-mandated recall, they will suffer from reduced performance and reduced miles per diesel gallon consumed. The vehicles will accordingly be less desirable both to their current owners, who would not have purchased them had the truth been told (indeed, could not have purchased them as they would not have passed EPA certification), and will also be worth less in the secondary market.

## II.     PARTIES

3.     Plaintiffs Donna and Tim Kirkman are residents of Lake Lotawana, Missouri.

4.     Plaintiff Bernie Williams is a resident of Horsham, Pennsylvania.

5.     Plaintiff Melanie Rodd is a resident of Vancouver, Washington.

6.     Defendant Volkswagen Group of America, Inc. ("VWoA" or "Defendant") is a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business in Herndon, Virginia. VWoA is duly qualified and licensed to do business in the State of Michigan, and in fact does business in all 50 states (including also the District of Columbia).

CLASS ACTION COMPLAINT - Page 2

### III.    JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy in this class action exceeds $5,000,000, exclusive of interest and costs, and some members of the class, including the named Plaintiffs, are citizens of states other than the states in which VWoA is incorporated and has its principal places of business.

8.    This Court has personal jurisdiction over VWOA because it is duly qualified and licensed to do business and in fact does substantial business in the State of Michigan.

9.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Among other things, VWOA has operations and sales in this District.

10.    Volkswagen conducts substantial business in this District.  Until approximately 2008, Volkswagen Group of America, Inc. was headquartered in Auburn Hills, Michigan.  And between 2008 and 2013, Volkswagen "invested about $12 million and added hundreds of employees at its offices in Auburn Hills."

11.    During the relevant time period, many of the wrongdoings giving rise to Plaintiffs' claims emanated from this District.  Of particular importance, Volkswagen's Engineering and Environmental Office—where, upon information

CLASS ACTION COMPLAINT - Page 3

and belief, the defeat device scheme was centralized—was located at Auburn Hills, Michigan. Because Volkswagen maintained, and continues to maintain, critical operations in this District, on information and belief, employees in this district witnessed and/or participated in the fraudulent activities giving rise to Plaintiffs' claims. Notably, when the EPA issued its Notice of Violation, described in greater detail below, it was addressed to only two people: David Geanacopoulos, the Executive Vice President of Public Affairs and General Counsel, at Volkswagen's Virginia headquarters, and Stuart Johnson, the General Manager of the Engineering and Environmental Office, at Volkswagen's Auburn Hills center.

## IV.   FACTUAL ALLEGATIONS

### A.    <u>VWoA's Marketing Campaign for "CleanDiesel"</u>

12.    VWoA is a wholly-owned subsidiary of non-defendant Volkswagen A.G. [Aktiengesellshaft], the largest automobile manufacturing company in the world. Volkswagen A.G., headquartered in Wolfsburg, Germany, is the parent company of well-known brands including Volkswagen, Porsche, Audi, Lamborghini, Bentley, SEAT, and Skoda. It also sells motorcycles under the Ducati brand; and commercial vehicles under the MAN, Scania, NeoPlan and Volkswagen Commercial Vehicles brand names. Of these marques, Volkswagen, Audi, Bentley, Porsche, Bugatti and Lamborghini cars are marketed and sold in the United States to the general car-buying public through VWoA.

13.    In the mid-2000s, California and several other states passed new emission standards strictly regulating exhaust emissions, including oxides of nitrogen (NOx). This effectively banned the sale of diesel passenger vehicles in these states because the nature of diesel engines inherently makes NOx emissions a particularly difficult problem to resolve. Facing the implementation of similarly stringent federal regulations, Volkswagen and several other manufacturers launched the joint BlueTec Diesel Initiative to research and develop "exhaust emission treatment systems which meet even the strictest emission regulations in the US market."

14.    Since the late 2000s, VWoA has marketed diesel-powered versions of certain of its Volkswagen and Audi cars, specifically, the Volkswagen Beetle, Jetta, Passat and Audi A3 as being better for the environment in that they polluted less, and as being more efficient in terms of gas mileage than previous diesel powered cars, while maintaining brisk performance in terms of the torque produced by the motors and consequent acceleration of the cars when driven. Indeed, the brochure for the 2015 Volkswagen Golf TDI Clean Diesel noted a range of 567 highway miles on a single tank, and that the "TDI Clean Diesel engine gives you long range without sacrifice."

15.    Other statements about clean diesel in Volkswagen marketing materials included how:

a. Clean diesel is "[f]or the eco-conscious and the high-performance-conscious;"

b. Clean diesel is "more efficient, eco-conscious, and fun to drive;"

c. Clean diesel technology "impacts fuel efficiency and performance, while being a more eco-conscious choice;" and

d. Volkswagen's manufacturing "continues to refine and perfect the clean diesel technology we have pioneered, which delivers a dramatic reduction in both fuel consumption and exhaust emissions and offers some of the cleanest and most efficient alternatives on the market today."

16. Consumers, including the named Plaintiffs herein, purchased the subject vehicles noted above from the model year 2009 and forward (the "Affected Vehicles") in reliance on statements such as this.

17. Defendant's success is based in large part on promoting their diesel cars as "clean" and "green" vehicles. Indeed, being both highly efficient and "clean" are the centerpieces of Defendant's diesel engine marketing campaign. "Clean Diesel" is in the very name of the vehicles about which Defendant lied.

18. Defendant's outward concern for the environment is projected beyond just the model names and purported attributes of their vehicles. For example, on the "Environment" page of its website, Volkswagen Group of America states that it takes "environmental responsibility very seriously. When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel

engines and developing totally new power systems, which utilize new fuel alternatives."

19. VWoA also advertised the fact that the Audi A3 TDI and VW Jetta TDI were named the 2010 Green Car of the Year and the 2009 Green Car of the Year, respectively.

20. Defendant also launched a "Think Blue" program ["Blue" has the same connotation in Europe that "Green" does in the United States], which it explained is part of a policy of being "more responsible on the road and more environmentally conscious—not just in our cars."

21. VWoA supported and directed a website to promote its "clean" diesel technology, www.clearlybetterdiesel.org, which says the technology reduces smog and "meets the highest standards in all 50 states, thanks to ultra-low sulfur diesel (ULSD) fuel and innovative engine technology that burns cleaner."

22. VWoA has charged a substantial premium for the Affected Vehicles, misleadingly marketed as "CleanDiesel." For example, for the 2015 Volkswagen Jetta, the base S (gas powered) model has a starting MSRP of $18,780. The base TDI S CleanDiesel, however, has a starting MSRP of $21,640, a price premium of $2,860. The CleanDiesel premium for the highest trim Jetta model is substantially higher: The highest level gas Jetta SE has a starting MSRP of $20,095, while the CleanDiesel TDI SEL MSRP is $26,410, a $6,315 premium.

CLASS ACTION COMPLAINT - Page 7

**B.**     **Federal and State Emissions Laws and Testing**

23.     The diesel internal combustion engine differs from the typical gasoline powered engine in that it uses highly compressed hot air to ignite the fuel rather than using a spark plug. As in a gasoline engine, the burning fuel rapidly expands, moving the piston, which transmits power to the crankshaft.

24.     The "Clean Diesel" vehicles that VWoA introduced in 2008 used a new-generation 2.0 Liter TDI with a common rail injection system. VWoA introduced the 2.0L TDI to accommodate increasing demand for improvements in sound, fuel consumption, and exhaust gas emissions. The engine utilizes a special computer-controlled exhaust gas after-treatment system that VWoA claimed met federal and CARB emission standards when first introduced.

25.     While the use of cleaner fuels and new technologies has improved certain types of emissions problems traditionally inherent in diesel engines, others remain. As a result of their high combustion and compression pressures, diesel engines typically produce high levels of NOx in the combustion process.

26.     Oxides of nitrogen (or NOx) are a highly reactive group of gases that the EPA and other government agencies have found to create environmental problems and public health hazards, including smog, ground-level ozone, and acid rain. For example, direct exposure to NOx can cause respiratory problems, such as lung irritation, bronchitis, or pneumonia. When NOx combines with sunlight, it

CLASS ACTION COMPLAINT - Page 8

may create photochemical smog, which appears as a brownish ground-level haze and causes chest pains, shortness of breath, coughing and wheezing, and eye irritation. NOx is one of the main ingredients involved in the formation of ground-level ozone. Breathing ozone can also trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion and can worsen bronchitis, emphysema, and asthma. Children are at the greatest risk of experiencing negative health impacts from exposure to ozone.  Exposure to these pollutants has been linked to serious health issues, including asthma attacks and other respiratory illness serious enough to send people to the hospital. When mixed with rain in the atmosphere, NOx can create nitric acid or acid rain. NOx is also a contributor to global warming. Because of the serious hazards created by NOx emissions, both the EPA and CARB have regulated NOx.

27.     Like all automobiles sold for public use in the United States of America, the Affected Vehicles were and are required under the Clean Air Act, 42 U.S.C. Section 7401, et seq., to be manufactured so that their emissions do not exceed certain standards for pollutants such as carbon monoxide and nitrogen oxides, or NOx.

28.     Regulations controlling the amount of pollutants such as nitrogen oxides are promulgated under the authority of the Environmental Protection Agency ("E.P.A."). New cars sold in the United States are required to pass tests to

CLASS ACTION COMPLAINT - Page 9

ensure that the models as produced are in compliance with regulations. In addition, many states, including the state of California, require periodic testing for pollutants, commonly referred to as "smog" testing. California's smog regulations are administered by the California Air Resources Board, or CARB.

29.    The federal Clean Air Act prohibits the sale of any vehicle in the United States that does not comply with emissions regulations set by the EPA. 42 U.S.C. § 7522. The current regulations, Tier 2, were implemented by the EPA between 2004 and 2009, and apply to all light-duty vehicles regardless of the fuel that they use. The Tier 2 regulations include certification levels of different levels of stringency, called certification bins. Volkswagen chose to certify its 2.0 liter diesel vehicles to the Tier 2, Bin 5 standard, which has a maximum NOx level of .05 g/mi for a vehicle's intermediate life (5 years/50,000 miles) and .07 g/mi for a vehicle's full useful life (10 years/120,000 miles). 40 C.F.R. § 86.1811-04(c). In addition, a manufacturer's fleet average of NOx for any given model year must be under .07 g/mi. *Id.* at § 86.1811-04(d).

30.    On the state level, CARB adopted Low-Emissions Vehicle (LEV) II emission standards that generally became applicable in the 2004 model year. *See* The California Low-Emission Vehicle Regulations, http://www.arb.ca.gov/msprog/levprog/cleandoc/cleancomplete%20levghg% 20regs%201-15.pdf (amended January 1, 2015); Cal. Code. Regs. Tit. 13 § 1961.

CLASS ACTION COMPLAINT - Page 10

Under the LEV II standard, NOx emissions were significantly tightened and required light-duty passenger vehicles (including the Affected Vehicles) to emit no more than .05 g/mi initially, and no more than .07 g/mi over their useful life. Cal. Code. Regs. Tit. 13 § 1961.

31.     To comply with EPA and CARB regulations concerning NOx, vehicle manufacturers use a variety of exhaust treatment systems to control NOx emissions. Exhaust gas recirculation (EGR) systems reintroduce some exhaust gases into the engine's intake. This lowers the peak temperature of combustion, which reduces the chance of NOx forming. Some vehicles use a lean NOx trap, a system that relies on the power control module's ability to toggle the air-fuel ratio between rich and lean. The trap absorbs NOx from exhaust during lean air mixtures, and ultimately reduces it to nitrogen gas when the air-fuel ratio is switched to a rich mixture and back to lean. Newer diesel vehicles may utilize selective catalytic reduction systems (SCR). SCR is a process that uses ammonia or urea water solutions in the exhaust stream to remove oxygen from NOx, forming water instead. SCR systems only work well within specific temperature ranges and when using specific proportions of chemicals.

32.     Federal and California regulations require manufacturers to apply for certifications that their vehicles meet applicable emission standards. 40 C.F.R. § 86.1843-01. The federal application must include a list of all auxiliary emission

CLASS ACTION COMPLAINT - Page 11

control devices installed on the vehicle. *Id.* at § 86.1844- 01(d)(11). An auxiliary emission control device is defined as "any element of design which senses . . . any . . . parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." *Id.* at § 86.1803-01. The federal application must also contain a detailed justification for each auxiliary emission control device that results in a reduction in the effectiveness of the emission control system, and a rationale for why it is not a "defeat device." *Id.* at § 86.1844-01(d)(11).

33.    Defeat devices are expressly forbidden by federal regulations. *See* EPA, *Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device* (Dec. 11, 1972); *see also* 40 C.F.R. §§ 86-1809-01, 86-1809-10, 86-1809-12. Stated simply, a defeat device is hardware or software that "defeats" the vehicle's emission controls during normal vehicle operation—enabling the vehicle to produce low emissions during emissions testing, but not during normal operation. The Clean Air Act makes it a violation for any person to sell, manufacture, or install any component in a motor vehicle "where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle . . . in compliance with the regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to

CLASS ACTION COMPLAINT - Page 12

such use." Clean Air Act, 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1854012(a)(3)(ii). Similarly, the EPA has specifically recognized that electronic control systems that affect the emission control system's performance may be defeat devices.  EPA, *Advisory Circular Number 24-2: Prohibition on Emission Control Defeat Devices – Optional Objective Criteria* (Dec. 6, 1978).

34.     Most modern engines, including Volkswagen's "CleanDiesel" engines, use computerized engine control systems to monitor sensors throughout a car's engine and exhaust systems and control operation of the car's systems to ensure optimal performance and efficiency. These functions can include controlling fuel injection, valve and ignition timing, and, as in Volkswagen's "CleanDiesel" engines, operating the engine's turbocharger. The engine control computer can, for example, ensure that the air-to-fuel mixture is correct based on sensor readings such as throttle position, amount of air flowing into the engine, and engine temperature.

35.     These engine control computers also receive data from sensors in the car's exhaust system that measure the amounts of chemical substances included in the car's exhaust. That data provides a measure of the engine's operation and efficiency, and is thus used by the engine control computer in operating the car's systems to ensure the desired performance and efficiency. Because modern cars include these sophisticated computers and sensors throughout the car's systems,

CLASS ACTION COMPLAINT - Page 13

emissions testing systems use a car's existing sensors to measure the presence of pollutants and track compliance with EPA and state emissions standards. Emissions testing stations plug a diagnostic device into the car's on-board diagnostics ("OBD II") port and use the car's exhaust sensors during the testing procedure to measure the substances emitted. Some states, instead of or in addition to an OBD II diagnostic device, use a measurement probe inserted into the car's exhaust pipe to estimate the chemicals emitted.

36.     VWoA programmed the engine control computers in the Affected Vehicles with software that detects when the cars are undergoing emissions testing, and then operates the car's engine and exhaust systems to ensure that emissions comply with EPA pollutant standards. When the car is not being emissions tested—that is, under the vast majority of operating conditions—the engine control systems operate the vehicle in a manner that does not comply with EPA emissions requirements.

37.     Every vehicle sold in the U.S. must be covered by Certificate of Conformity from the EPA. 40 C.F.R. § 86.1843-01. However, vehicles are only covered by a Certificate of Conformity if they are sold as described in the manufacturer's application for certification. *Id.* at §86.1848-10(c)(6). Similarly, auto manufacturers must be certified by CARB in order to sell vehicles in California. Motor vehicles equipped with defeat devices, which reduce the

CLASS ACTION COMPLAINT - Page 14

effectiveness of the emission control system during normal driving conditions, cannot be certified.

38.     Both federal and California regulations mandate that manufactures include certain emissions-related labels on the vehicles they sell. First, the regulations require that an emissions label titled "Vehicle Emission Control Information" be placed under the hood or in the engine compartment and contain "an unconditional statement of compliance" with federal and California emissions regulations. 40 C.F.R. § 86.1807-01; Cal. Code. Regs. Tit. 13 § 1965. Auto manufacturers must affix this label to every motor vehicle that they intend to sell to the public in the United States subject to the applicable emissions standards.  The diesel cars sold in the U.S. by VWoA carried these labels.

39.     Beginning in the 1998 model year, a Smog Index label began appearing on all new cars sold in California. The label was intended to help consumers compare smog forming emissions from different vehicles within that model year. Cars manufactured after January 1, 2009, were also required to affix an Environmental Performance label. These labels provided both a Smog Score and a Global Warming Score, ranging from 1 to 10, with 10 being the cleanest and 5 being the average vehicle.  The diesel cars sold by VWoA in the United States carried these labels, which were inaccurate and misleading in light of the use of a defeat device.

CLASS ACTION COMPLAINT - Page 15

40. In May 2014, West Virginia University's Center for Alternative Fuels, Engines & Emissions published the results of a study titled "In-Use Emissions Testing of Light-Duty Diesel Vehicles in the United States" ("the CAFEE Report"). Commissioned by the International Council on Clean Transportation, the CAFEE Report that found in-use emissions from two Volkswagen vehicles (a 2012 Jetta and a 2013 Passat) were significantly higher than the Tier 2 Bin 5 NOx standard. The Jetta exceeded the standard by 15 to 35 times and the Passat exceeded it by 5 to 20 times.

41. Following publication of the study, the EPA and CARB began to investigate the issue. VWoA responded that increased emissions could be the result of unexpected technical issues or conditions. VWoA initiated testing to replicate the ICCT/WVU testing and identify the technical reasons for the high on-road emissions. VWoA shared the results of this testing and a proposed recalibration fix for the Gen1 (Lean NOx Trap technology) and Gen2 (Selective Catalytic Reduction (SCR) technology) with CARB staff on December 2, 2014. Based on this meeting, CARB and EPA at that time agreed that VWoA could implement the software recall; however, CARB cautioned VWoA that if confirmatory testing showed that the fix did not address the on-road NOx issues, they would have to conduct another recall.

CLASS ACTION COMPLAINT - Page 16

42.     Based on this meeting, VWoA initiated a voluntary recall on December 16th, 2014 which, according to VWoA, affected approximately 500,000 vehicles throughout the United States. The recall affected all 2009 to 2014 model-year diesel fueled vehicles equipped with Gen1 and Gen2 technology. This recall was claimed to have fixed among other things, the increased real world driving NOx issue.

43.     The recall's primary objective as stated in the notice was not emissions related but rather involved premature turbocharger failure - "Some vehicles may experience exhaust turbocharger failure (under extreme cold weather conditions) in a brief time period after initial vehicle start up." The emissions aspect of the notice was placed in an "In addition…" paragraph and was still misleading as to the reason for the recall.

44.     VWoA made a second attempt to fix the problem beginning in April 2015, when it issued VW Action Code 2306, which was a recall for Clean Diesel equipped vehicles. A copy of the recall notice is Exhibit C hereto.  VWoA claimed that the recall was a "repair" and that it "improved" the engine management system. But many owners recorded a marked decrease in fuel efficiency and performance after the recall was completed.

45.    In its notice of Emissions Service Action 2306, which was sent through the United States Mail to owners of the Affected Vehicles, the VWoA falsely asserted that it:

1. Had "an ongoing commitment to [the] environment;"

2. That it was "cooperat[ing] with the United States Environmental Protection Agency and the California Air Resources Board;' and

3. That the recipient's "vehicle's engine management software has been proved to assure your vehicles tailpipe emissions are optimized and operating efficiently."

46.    On May 6, 2015 CARB commenced confirmatory testing to determine the efficacy of the recall on both the Gen1 and Gen2 vehicles. CARB confirmatory testing was completed on a 2012 model-year Gen2 Volkswagen test group CVWX02.0U4S, to be followed with Gen1 testing. CARB staff tested this vehicle on required certification cycles (FTP, US06 and HWFET) and over-the-road using a Portable Emission Measurement Systems (PEMS). On some certification cycles, the recall calibration resulted in the vehicle failing the NOx standard. Over-the-road PEMS testing showed that the recall calibration did reduce the emissions to some degree but NOx emissions were still significantly higher than expected.

47.    CARB shared its test results with VW on July 8, 2015. CARB also shared its results with the EPA. Several technical meetings with VW followed where VW disclosed that Gen1, Gen2 and the 2015 model-year improved SCR

vehicle (known as the Gen3) had a second calibration intended to run only during certification testing. Those findings led the EPA to continue its own investigation.

48.     CARB and the EPA told Volkswagen that they would not approve certificates of conformity for Volkswagen's 2016 model year diesel vehicles until it explained the results, leading Volkswagen finally to admit that it had been deceiving the government and consumers.

49.     In a meeting with CARB and EPA staff on September 3, 2015, Volkswagen admitted that the Affected Vehicles were designed and manufactured with a defeat device in the form of a sophisticated software algorithm that detected when the vehicle was being tested for emissions standards based on inputs including the position of the steering wheel, vehicle speed, the duration of the engine's operation, and barometric pressure. These inputs track the parameters of the federal and state procedures used for certification testing.  During EPA emission testing, the vehicles' electronic control modules ran a particular calibration called the "dyno calibration" (referring to the equipment used in emissions testing–the dynamometer) that produced compliant emissions results. At all other times during normal vehicle operation, the vehicle software ran a separate "road calibration" that reduced the effectiveness of the lean NOx trap and SCR emission control systems. As a result, emissions of NOx increased by a factor of 10 to 40 times above EPA compliant levels when driven by a consumer.

CLASS ACTION COMPLAINT - Page 19

50.     The Engine Control Unit, or ECU, and engine management software residing within are designed and manufactured by Robert Bosch GmbH ("Bosch"), a German multinational engineering and electronics company. In addition to the ECU, Bosch supplies other key components, such as the high pressure pump, low pressure exhaust gas recirculation pressure sensors, cam sensors, lambda sensors, hot film air mass sensor, and glow timing electronic control unit. The engine management software is equipped with a feature that is commonly referred to as a Dyno mode or Test mode.

51.     When emissions system and fuel economy and other similar testing is conducted during vehicle development the vehicle is placed on a dynamometer-- which can be thought of as two big rollers or a treadmill—rather than driving on the road. The vehicle has only its driving wheels rolling (the front ones, in the case of the affected vehicles). But the rear tires are stationary. The vehicle could otherwise interpret the test procedure as a dangerous situation or malfunction, activating traction control or stability control, so instead during these developmental tests the engine management software is placed into Dyno mode. By enabling the Dyno or Test Mode, the vehicle is able to operate during the test process.

52.     VWoA has used this feature of the software to serve as a "switch" that will turn the vehicle's emission controls on and off based on whether the vehicle is

CLASS ACTION COMPLAINT - Page 20

on the open road (switch off) or being tested for emissions (switch on). In effect

when emissions testing is performed on one of these vehicles the emission system

turns "on" once a certain set of parameters are met which can include steering

wheel position, rear wheel speed, air flow and others. Once the test is complete and

the car is restarted, the car reverts to its normal function. And once the cars are in

on-the-road mode, nitrogen oxide levels can increase by as much as 10 to 40 times

the federal standard.

53.    Robert Bosch warned VWoA in 2007 that it would be illegal to sell

cars with emissions control software that turned on only during emissions tests, but

Bosch continued supplying the systems either fully aware of the defeat devices or

blindly choose to ignore what VWoA was doing upon installation using the

software Bosch had provided.

54.    In addition, a group of Volkswagen engineers discovered the use of

the defeat device in 2011 and brought it, and the fact that the device was illegal, to

the attention of company management. This report was not acted upon and VWoA

continue utilizing the defeat device.

**C.    VWoA Was Issued a Notice of Violation and Required To Recall 482,000 Cars**

55.    On September 18, 2015 The E.P.A. formally accused VWoA of using

software to detect when the car is undergoing its periodic state emissions testing.

A copy of the Notice of Violation is Exhibit A hereto.  Again, contrary to the

CLASS ACTION COMPLAINT - Page 21

ordinary and expected operation of emissions controls, which are designed to operate at all times, it is only during such tests that the affected VWoA cars' full emissions control systems are turned on. During normal driving situations, the controls are turned off, allowing the cars to spew as much as 40 times as much pollution as allowed under the Clean Air Act, the E.P.A. said. This software produced and used in the Affected Vehicles by VWoA is a "defeat device" as defined by the Clean Air Act.

56.     VWoA's defeat device used software and sophisticated algorithms to detect when the cars were undergoing emissions testing, and only then fully engaged pollution suppression systems to ensure that emissions complied with regulatory standards. When the car was not being emissions tested—that is, under all other operating conditions—the electronic engine control systems operated the vehicle with no regard for regulatory emissions restrictions but rather for performance and fuel economy. The result is that VWOA's Clean Diesel vehicles would meet emissions standards in labs or testing stations, but at all other times emit NOx at up to 40 times the standard allowed under United States laws and regulations.

57.     In a statement on September 20, 2015, Volkswagen CEO Martin Winterkorn said the company was "deeply sorry that we have broken the trust of our customers and the public." Regarding the allegations by the EPA, a

CLASS ACTION COMPLAINT - Page 22

spokesperson for VWoA stated: "We have admitted it to the regulator. It is true. We are actively cooperating with the regulator." VWoA also announced that it was halting sales of all 2.0L TDI engine vehicles in the United States. Because disengaging pollution controls can yield better performance, implementing changes to the emissions system will impact vehicle performance and fuel economy.

58.     The recall covers roughly 482,000 diesel passenger cars sold in the United States since 2009, including the 2009-15 Volkswagen Jetta, 2009-15 Beetle, 2009-15 Golf, 2014-15 Passat and 2009-15 Audi A3. Each of these cars was sold with a so-called "defeat device" intended to thwart emissions testing. The state of California has issued a separate notice of violation to the company.  A copy of that notice is California, the E.P.A. and the Justice Department are working together on an investigation of the allegations.

59.     As noted above, the Clean Air Act requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emissions standards to control air pollution. Every vehicle sold in the United States must be covered by an EPA issued certificate of conformity. Under federal law, cars equipped with defeat devices, which reduce the effectiveness of emissions control system during normal driving conditions, cannot be certified. By manufacturing and selling cars with defeat devices that allowed for higher levels of

emissions that were certified to EPA, VWoA violated the Clean Air Act, defrauded its customers, and engaged in unfair competition under state and federal law.

60.    At all times relevant to this action, VWoA was involved in the manufacturing distribution, sale and warranting of the Affected Vehicles under the Volkswagen and Audi brand names throughout the United States. Volkswagen and/or its agents designed, manufactured, and installed the Clean Diesel engine systems in the Affected Vehicles, which included the "defeat device." VWoA also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

61.    According to *The Detroit News*, Defendants are reportedly under investigation by German prosecutors, at least 29 U.S. state attorneys general, and by the U.S. Justice Department aided by the Federal Bureau of Investigation (FBI).[1]  These ongoing investigations are occurring in this District,[2] and the EPA's main testing lab is located in Ann Arbor, Michigan.

62.    On October 4, 2015, *The New York Times* reported Volkswagen's "Engine-Rigging Scheme" may have begun as early as 2008. "Volkswagen installed software designed to cheat on emissions tests in 2008 after realizing that a

---

[1] http://www.detroitnews.com/story/business/autos/foreign/2015/09/28/vw-senators/72989290/.

[2] ("The FBI in Detroit is reportedly handling a US criminal investigation" as well). http://www.telegraph.co.uk/finance/newsbysector/industry/11895848/BREAKING-2.1-million-Audi-cars-fitted-with-VW-emissions-cheat-devices.html (last visited Oct. 6, 2015).

new diesel engine, developed at great expense, could not meet pollution standards in the United States and other countries, people with knowledge of the automaker's internal inquiry said.… [r]ather than stop production of the engine and throw out years of work and investment, managers decided to cheat."[3]

63.    Although Volkswagen of America moved its headquarters to Herndon, VA in or about 2008, Defendants had reportedly "invested about $12 million and added hundreds of employees at [their] offices in Auburn Hills, (Michigan) since 2008."[4] On information and belief, the large number of employees in this region, during the period in which this scheme began, was perpetrated, and was uncovered, means that employees in Michigan witnessed, reported, and/or had or have knowledge of Volkswagen's conduct with respect to the Defeat Device Vehicles.

64.    Volkswagen moved its U.S. headquarters to Detroit in 1983 and opened its Auburn Hills building in 1989.[5]  Moving their headquarters outside of metro Detroit did not preclude Volkswagen from maintaining operations in the region. "While we've moved some operations outside of Detroit, this really is the

---

[3] *The New York Times*, Volkswagen Engine-Rigging Scheme Said to Have Begun in 2008, available at http://www.nytimes.com/2015/10/05/business/engine-shortfall-pushed-volkswagen-to-evade-emissions-testing.html?partner=socialflow&smid=tw-nytimesbusiness&smtyp=cur&_r=0 (last visited Oct. 6, 2015).

[4] http://archive.freep.com/article/20131201/COL14/312010056/volkswagen-auburn-hills-herndon-virginia (last visited Oct. 6, 2015).

[5] *Id.*

center of the U.S. automotive industry," Sheriece Matias, manager of corporate communications for Volkswagen reportedly said. "We have always believed it's crucial to maintain operations here."[6] Because Defendants maintained, and continue to maintain, operations in this District, on information and belief, Defendants' employees in this District witnessed and/or participated in Defendants' Defeat Device Vehicle scheme.

65.     In particular, Defendants' Engineering and Environmental Office is located in Auburn Hills. This is one of the departments of Volkswagen's United States operations most likely to have had knowledge of the Defeat Devices. The EPA addressed its Notice of Violation to Volkswagen AG and Audi AG to the General Manager of that office, as well as to the Executive Vice President of Public Affairs and General Counsel.

**D.      The Recalled Cars Will Be Less Efficient, Less Powerful, and Less Valuable**

66.     VWoA has been ordered by the EPA to recall the Affected Vehicles and repair them so that they comply with EPA emissions requirements at all times during normal operation. However, VWoA will not be able to make the Affected Vehicles comply with emissions standards without substantially degrading their performance characteristics, including their horsepower and their fuel efficiency.

---

[6] http://athome.volkswagengroupamerica.com/documents/at_work_in_virginia.pdf

67.     Experts in automotive technology have said that disengaging the pollution controls on a diesel-fueled car can yield better performance, including increased torque and acceleration. "When the pollution controls are functioning on these vehicles, there's a trade-off between performance and emissions," said Drew Kodjak, executive director of the International Council on Clean Transportation ("ICCT"), a research group. He stated, "[t]his is cutting corners." The ICCT, again, is the entity that brought the issue to the attention of the E.P.A., which conducted further tests on the cars, and ultimately discovered the use of the defeat device software.

68.     Because there is a tradeoff between emissions and performance of the engines, even if VWoA is able to make Class members' Affected Vehicles EPA compliant, Class members will nonetheless suffer actual harm and damages because their vehicles will no longer perform as they did when purchased and as advertised. This will necessarily result in a diminution in value of every Affected Vehicle and it will cause owners of Affected Vehicles to pay more for fuel while using their affected vehicles.

69.     As a result of VWoA's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Affected Vehicles emit 40 times the allowed levels, owners and/or lessees of the Affected Vehicles have suffered losses in money and/or property. Had Plaintiffs

CLASS ACTION COMPLAINT - Page 27

and Class members known of the "defeat device" at the time they purchased or leased their Affected Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did. Moreover, when and if VWoA recalls the Affected Vehicles and degrades the Clean Diesel engine performance in order to make the Affected Vehicles compliant with EPA standards, Plaintiffs and the Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased. Moreover, affected vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency.

70.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of Affected Vehicles. Plaintiffs seek damages, injunctive relief, and equitable relief for the conduct of VWoA related to the "defeat device," as alleged in this complaint.

## E.     Plaintiffs' Purchases / Leases

71.     Plaintiffs Donna and Tim Kirkman selected and ultimately leased their vehicle, in part, because of the "CleanDiesel" system, as represented through advertisements and representations made by Volkswagen and Audi.  Plaintiffs Donna and Tim Kirkman leased a 2015 VW Passat, from a Volkswagen dealer in Summit, Missouri in the belief that the car was environmentally friendly and efficient while offering great diesel performance. Prior to their lease of the vehicle

at issue, Plaintiffs recall viewing advertisements regarding VW's CleanDiesel, in addition to verbal representations made to them at the VW dealer about the CleanDiesel system. They recall that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.

72.   Plaintiff Melanie Rodd selected and ultimately purchased her vehicle, in part, because of the "CleanDiesel" system, as represented through advertisements and representations made by Volkswagen and Audi.  Plaintiff Plaintiff Rodd purchased a 2009 VW Jetta TDI, from a Volkswagen dealer in Beaverton, Oregon in the belief that the car was environmentally friendly and efficient while offering great diesel performance. Prior to her purchase of the vehicle at issue, Plaintiff recalls viewing advertisements regarding VW's CleanDiesel, in addition to verbal representations made to her at the VW dealer about the CleanDiesel system. She recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.

73.   Plaintiff Bernie Williams selected and ultimately leased his vehicle, in part, because of the "CleanDiesel" system, as represented through advertisements and representations made by Volkswagen and Audi.  Plaintiff Williams leased a 2015 VW TDI Passat, from a Volkswagen dealer in Warrington, Pennsylvania in

the belief that the car was environmentally friendly and efficient while offering great diesel performance. Prior to his lease of the vehicle at issue, Plaintiff recalls viewing advertisements regarding VW's CleanDiesel, in addition to verbal representations made to her at the VW dealer about the CleanDiesel system. He recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.

74.    None of the advertisements reviewed or representations received by Plaintiffs (or other class members) contained any disclosure relating to the "defeat device" or that VWoA had purposefully falsified its certification of EPA compliance. Had VWoA disclosed that the CleanDiesel in their vehicles actually emitted 40 times the permitted levels of pollutants, including NOx, they would not have purchased or leased their vehicles with the CleanDiesel engine, or would have paid less for their vehicles or leases.

75.    Plaintiffs (and the class) have suffered an ascertainable loss as a result of Volkswagen's omissions and/or misrepresentations associated with the CleanDiesel engine system, including but not limited to, out-of-pocket loss and future attempted repairs, future additional fuel costs, and diminished value of her vehicle. Among, other things, Plaintiffs paid a premium over the price of an equivalent model gas-powered VW.

## V.   CLASS ACTION ALLEGATIONS

76.    Plaintiffs brings this action on behalf of  themselves  and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following defined class (the "Nationwide Class"):

**Nationwide Class**

All persons or entities in the United States who are current or former owners and/or lessees of an "Affected Vehicle." Affected Vehicles include, without limitation (diesel models only): Model Year 2009-2015 VW Jetta; Model Year 2009-2015 VW Beetle; Model Year 2009-2015 VW Golf; Model Year 2014-2015 VW Passat; and Model Year 2009-2015 Audi A3.

77.    Specifically excluded from the Class above are: (a) all federal court judges who preside over this case and their spouses; (b) all persons who elect to exclude themselves from the Class; and (c) VWoA's employees, officers, directors, agents, and representatives and their immediate family members. Also excluded from the Class are VWoA and its subsidiaries and affiliates (including but not limited to Volkswagen A.G. and its subsidiaries); and governmental entities. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

## A.   Numerosity

78.   The class is composed of thousands of owners (approximately approximately 482,000 nationwide), making joinder impracticable. The disposition of their claims in a single class action will provide substantial benefits to all parties and to the Court. The exact number of Class Members is unknown, but the class covers in excess of 482,000 vehicles.

## B.   Typicality

79.   There is a well-defined community of interest among the Class Members. Plaintiffs' claims are typical of the Class Members' claims in that the representative Plaintiffs, like all Class Members, owns one on the listed vehicles manufactured, marketed, and sold by VWOA. Plaintiffs, like all Class Members, have been damaged by VWOA's misconduct. The factual basis of VWOA's misconduct is common to all Class Members and represents a common thread of misconduct and/or acts and/or omissions resulting in similar injuries to all Class Members.

## C.   Commonality

80.   There are common questions of law and fact making this action appropriate for class action treatment. Some of the common questions include:

    a.   Whether VWOA fraudulently concealed from and/or failed to disclose to the Plaintiffs and Class Members the true nature of the emissions standards;

CLASS ACTION COMPLAINT - Page 32

b.    Whether VWOA's conduct in selling and marketing the listed vehicles was negligent, wanton, or willful;

c.    Whether VWOA breached its express warranty to Plaintiffs and Class Members;

d.    Whether VWOA breached its implied warranty to Plaintiffs and Class Members;

e.    Whether the performance of the listed vehicles is not as advertised and/or promoted by VWOA;

f.    Whether the Plaintiffs and the Class Members are entitled to damages and the amount of such damages; and

g.    Whether the Plaintiffs and the Class Members are threatened with irreparable harm and whether they are entitled to injunctive and/or other equitable relief, including requiring VWoA to reimburse the Class, and buy back and/or replace the vehicles.

## D.    Adequacy of Representation

81.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained the undersigned counsel, with substantial experience in prosecuting class actions. Plaintiffs and their counsel are committed to prosecuting this case vigorously on behalf of the Class and have the financial

resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the Class.

82.    A class action is superior to other methods for the fair and efficient adjudication of the subject controversy. Absent a class action, most Class Members will likely find the cost of litigating their individual claims to be prohibitive, and will have no effective remedy at all. Because of the relatively small size of the individual Class Members' claims, few Class Members could likely afford to seek legal redress for VWoA's misconduct. Absent a class action, Class Members will continue to incur damages and be at risk of irreparable harm while VWoA's misconduct will proceed without remedy.

**E.    Superiority**

83.    The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and litigants, and promotes consistency and efficiency of adjudication. Additionally, VWoA engaged in the same or similar misconduct towards the Plaintiffs and Class Members, thus requiring court imposition of uniform relief to insure compatible standards of conduct toward the Class as a whole.

CLASS ACTION COMPLAINT - Page 34

## VI.    TOLLING OF STATUTE OF LIMITATIONS

84.    All limitations periods were tolled by the doctrines of fraudulent concealment, the discovery rule, and/or equitable tolling. As alleged herein, VWoA wrongfully concealed the facts relating to the claims alleged. Plaintiffs and Class Members did not discover the operative facts that are the basis of their claims because they were concealed from the public, including Plaintiffs and the Class Members, by VWoA. No amount of diligence by Plaintiffs or Class Members could have led to discovery of these facts because they were kept secret by VWoA and, therefore, Plaintiffs and Class Members were not at fault for failing to discover these facts, nor did they have actual or presumptive knowledge of facts sufficient to put them on inquiry.

85.    Class Members had no way of knowing about VWoA's deception with respect to its Clean Diesel engine system and "defeat device." It took federal EPA and California Air Resources Board investigations to uncover VWoA's deception, which involved sophisticated software manipulation on VWoA's part. As reported by the *Los Angeles Times* on September 18, 2015, it took California Air Resources Board testing on a special dynamometer in a laboratory, open road testing using portable equipment, and the use of special testing devised by the Board to uncover VWoA's scheme and to detect how software on the engine's

CLASS ACTION COMPLAINT - Page 35

electronic control module was deceiving emissions certifications tests. Plainly, VWoA was intent on expressly hiding its behavior from regulators and consumers.

## VII.   CAUSES OF ACTION

### COUNT I:
### Breach Of Express Warranty

86.    Plaintiffs incorporate and reallege by reference those paragraphs set out above as though fully set forth herein.

87.    VWoA provided Plaintiffs and the Class Members with an express warranty.

88.    This warranty became part of the basis of the bargain.

89.    VWoA breached this express warranty.

90.    VWoA has actual knowledge of the specific common defects associated with the listed Affected Vehicles (described above) and the problems resulting therefrom.

91.    VWoA was on notice of the problems from the outset, as it intentionally designed its software "defeat device" to allow the Affected Vehicles to become certified and pass emissions tests.

92.    As a result of VWoA's breach, Plaintiffs and the Class Members suffered damages.

CLASS ACTION COMPLAINT - Page 36

93.    Plaintiffs and the Class Members also suffered diminution in the value of their vehicles, and out-of-pocket expenditures.

94.    VWoA's conduct is the direct and proximate cause of Plaintiffs' and the Class Members' injuries.

95.    Plaintiffs and the Class Members are entitled to legal and equitable relief against VWoA, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT II:
## Breach Of Implied Warranty Of Merchantability

96.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

97.    When the subject vehicles left VWoA's possession, they were unmerchantable. Plaintiffs and the Class Members used their vehicles in the normal manner for which the vehicles were designed. Despite Plaintiffs' and the Class Members' proper use of the vehicles, they failed to perform as required.

98.    The vehicles at issue are inadequate and incapable of performing the very tasks they were designed to carry out.

99.    VWoA has actual knowledge of the specific defects associated with the listed vehicles and the problems resulting therefrom.

100.    To date, VWoA has neither adequately cured the issue nor replaced the defective vehicles.

101.    As a result of VWoA's breach of implied warranty of merchantability, Plaintiffs and the Class Members suffered damages.

102.    Plaintiffs and the Class Members also suffered diminution in the value of their vehicles

## COUNT III:
## Magnuson - Moss Act (15 U.S.C. §§ 2301, *et seq*.)

## Express and Implied Warranty

103.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

104.    Plaintiffs assert this cause of action on behalf of themselves and the other members of the Class.

105.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 2301(3).

106.    VWoA's Affected Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

107.    Plaintiffs and the Class members are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

108.    VWoA is a "warrantor" and "supplier" as those terms are defined in 15 U.S.C. § 2301(4) and (5).

CLASS ACTION COMPLAINT - Page 38

109. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

110. VWoA provided Plaintiffs and Class members with "implied warranties," as that term is defined in 15 U.S.C. § 2301(7).

111. Defendant provided purchasers and lessees of Class Vehicles multiple written warranties as defined by 15 U.S.C. § 2301(6).

112. VWoA has breached these implied warranties as described in more detail above. Without limitation, VWoA's Affected Vehicles are defective, as described above, which resulted in the problems and failures also described above.

113. By VWoA's conduct as described herein, including VWoA's knowledge of the defects inherent in the vehicles and its action, and inaction, in the face of the knowledge, VWoA has failed to comply with its obligations under its written and implied promises, warranties, and representations.

114. In its capacity as a warrantor, and by the conduct described herein, any attempts by VWoA to limit the implied warranties in a manner that would exclude coverage of the defective software and systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective the software and supporting systems is null and void.

115. All jurisdictional prerequisites have been satisfied.

CLASS ACTION COMPLAINT - Page 39

116.   Plaintiffs and members of the Class are in privity with VWoA in that they purchased the software from VWoA or its agents.

117.   As a result of VWoA's breach of express and implied warranties, Plaintiffs and the Nationwide Class members are entitled to revoke their acceptance of the vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. §2310.

118.   VWoA provided Plaintiffs and each member of the Nationwide Class who purchased a new Affected Vehicle with a Manufacturer's Warranty, which provides "bumper-to-bumper" limited express warranty coverage for a minimum of 3 years or 36,000 miles, whichever comes first. This warranty covers emissions related repairs. This warranty is directly applicable to the Affected Vehicles.

119.   As required by law, VWoA also provided a Federal Emissions Warranty to members of the Nationwide Class and a California Emissions Warranty to California members of the Class. Vehicles certified to meet California emissions standards and registered in states which have adopted those standards are also entitled to coverage under the California Emissions Warranty.

120.   Consistent with federal law, VWoA provided Plaintiffs and the proposed Nationwide Class with a "performance warranty" and a "design and defect warranty." In the event that a vehicle fails an emissions test, these warranties cover all emissions related parts for 2 years or 24,000 miles (whichever

CLASS ACTION COMPLAINT - Page 40

comes first), with the catalytic converter, engine control unit, and onboard diagnostic device covered for 8 years or 80,000 miles (whichever comes first). These warranties are directly applicable to the Affected Vehicles.

121. California law requires additional warranty coverage beyond that required by federal law. Under California law, all emissions related performance and parts are covered for 3 years or 50,000 miles (whichever comes first), and a vehicle-specific list of more expensive emissions related parts is covered for 7 years or 70,000 miles (whichever comes first). In addition, the 8 year or 80,000 mile coverage for the catalytic converter, engine control unit, and onboard diagnostic device required by Federal law also applies. 13 Cal. Code. Regs. § 2038; see Cal. Health & Safety Code § 43205. The California Emissions Warranty provisions described here cover vehicles up to 14,000 pounds GVWR, and are directly applicable to the Affected Vehicles.

122. VWoA breached these express warranties by selling the Affected Vehicles with a defeat device which renders the emissions control systems defective, and the Class Vehicles thus do not comply with emissions standards set by federal law. This device cannot be repaired or redressed without materially altering the advertised estimated fuel economy and other performance characteristics of the vehicle.

123. VWoA's breach of warranty has deprived Plaintiffs and other Class members of the benefit of their bargain. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

124. VWoA had an opportunity to disclose information concerning the Class Vehicles' inability to perform as warranted, and to cure its breach of warranties, at least since May 2014, in response to the West Virginia study and in response to inquiries by the EPA and CARB. And yet VWoA has failed to do so.

125. As a direct and proximate result of VWoA's conduct, Plaintiffs and other members of the Nationwide Class have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease, that is, the difference between the value of the vehicle as promised and the value of the vehicle as delivered. Plaintiffs and members of the Nationwide Class are entitled to legal and equitable relief against VWoA, including damages, specific performance, attorney fees, costs, and other relief as appropriate.

## COUNT IV:
### Breach Of State Consumer Fraud Acts

126. Plaintiffs incorporate and reallege the allegations set forth above as if fully set forth herein.

CLASS ACTION COMPLAINT - Page 42

127.   Plaintiffs and the Class Members are "consumers," as defined by the Consumer Fraud Acts under the laws of the fifty states.

128.   VWoA is a "person" within the meaning of Consumer Fraud Acts.

129.   VWoA's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the Consumer Fraud Acts.

130.   By failing to disclose the common root cause defects in the vehicles (and failing to properly repair the defective engines), VWoA engaged in "unfair" or "deceptive acts or practices" prohibited by the Consumer Fraud Acts.

131.   VWoA intended that Plaintiffs and the Class Members rely on their misrepresentations and omissions, so Plaintiffs and the Class Members would purchase the vehicles. Plaintiffs and the Class Members did rely on VWOA's misrepresentations and omissions when they purchased VWoA vehicles.

132.   VWoA owed Plaintiffs and the Class members a duty to disclose the truth of the defects.

133.   Information regarding these defects is material to a reasonable consumer in deciding to purchase or lease a vehicle and considering how much to pay for a vehicle or lease.

134.   A reasonable consumer who had known of the defective nature of the listed vehicles would not have purchased or leased VWoA vehicles.

CLASS ACTION COMPLAINT - Page 43

135. VWoA's unfair or deceptive acts, practices, misrepresentations and/or omissions were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the vehicles.

136. As a result of the foregoing acts and omissions, VWoA violated the Consumer Fraud Acts of all jurisdictions, and Plaintiffs and the Class Members suffered actual damages as described herein. These Class Members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

## VIII. PRAYER

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray that the Court enter judgment against VWoA, and in favor of Plaintiffs and the Class Members, and to award the following relief:

a. Certification of the proposed Class and subclass under Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiffs as Class Representative and her counsel as Class Counsel;

b. A declaration that VWoA is financially responsible for notifying all Class Members of the nature of the problem, and for payment of the costs and expenses of fixing said issues;

CLASS ACTION COMPLAINT - Page 44

c. An award of consequential and other damages for the acts complained of herein;

d. A determination of VWoA's liability for exemplary damages;

e. An award of attorney's fees and costs, plus interest as allowed by law; and

f. Such other and further relief as the Court deems just and proper.

## IX. PLAINTIFFS DEMAND A TRIAL BY JURY

RESPECTFULLY SUBMITTED this 30th day of November, 2015.

**KELLER ROHRBACK L.L.P.**

*/s/ Tana Lin*

Lynn Lincoln Sarko
Amy Williams-Derry
Tana Lin, Bar No. P63125
Gretchen Freeman Cappio
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
awilliams-derry@kellerrohrback.com
tlin@kellerrohrback.com
gcappio@kellerrohrback.com

**AUDET & PARTNERS, LLP**

/s/ William M. Audet

William M. Audet
711 Van Ness Avenue, Suite 500
San Francisco CA 94102-3229
Tel.:   (415) 568-2555
Fax:   (415)568-2556
Email: waudet@audetlaw.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT - Page 45